IN THE

INDIANA COURT OF APPEALS

Appellate Case No. 21A-CC-00904

| | | |
|---|---|---|
| CT102 LLC d/b/a JD BYRIDER OF | ) | |
| NEW HAVEN and METRO MOTORS, | ) | |
| And HERMAN JEFFREY BAKER, | ) | |
| | ) | |
| Appellants, | ) | Appeal from the |
| Herman Jeffrey Baker, | ) | |
| Defendants below, | ) | Marion Superior Court |
| | ) | |
| v. | ) | Trial Court Case No.: |
| | ) | 49D06-1812-CC-047850 |
| AUOMOTIVE FINANCE CORP. | ) | |
| | ) | The Honorable Kurt Eisgruber, |
| Appellee, | ) | Judge |
| AFC, | ) | |
| Plaintiff below. | ) | |

---

**APPELLANTS' BRIEF**

---

Julie A. Camden, #26789-49
**CAMDEN & MERIDEW, P.C.**
10412 Allisonville Road, Suite 200
Fishers, IN 46038
Direct Dial: (317) 770-0000
Telefax: (888) 339-9611
jc@camlawyers.com
Attorney for Appellant

Exhibit 2 (1 of 30)

**TABLE OF CONTENTS**

Page

I.      Table of Authorities …………………………………………………………… 3

II.    Statement of the Issues …………………………………………………….... 3

III.   Statement of the Case ……………………………………………………....3

IV.   Statement of the Facts…………………………………………………… 5

V.    Summary of the Arguments……………………………………………….. 6

VI.   Argument …………………………………………………………....... 6

      A.  The trial court committed reversible error in awarding the wrong amount of damages for Defendant's Breach of Contract to Plaintiff's, when the exhibits show a lower amount of damages than what the judge awarded……………… ……………… 6

VII.  Conclusion………………………………………………………………… 8

VIII. Word Count Certification……………….………………………………… 9

IX.   Certificate of Service………………...…………………………………….. 9

X.    Appealed Judgment or Order…………………..……………………………… ..

*attached*

Exhibit 2 (2 of 30)

## I. TABLE OF AUTHORITIES

| CASES | Page |
|---|---|
| *Brant Const. Co. v. Lumen Const. Co.*, 515 N.E.2d 868, 872 (Ind. Ct. App. 1987). | 7 |
| *Forbes v. Walgreen Co.,* 566 N.E.2d 90(Ind. Ct. App. 1991)……………………… | 7 |
| *Menard, Inc. v. Comstock*, 922 N.E.2d 647, 650 (Ind. Ct. App. 2010)…………….... | 7 |
| *National Advertising Co. v. Wilson Auto Parts, Inc.*, 569 N.E.2d 997, 1001 (Ind. Ct. App. 1991)…………………….…………………………………………… | 7 |

## II.    STATEMENT OF THE ISSUES

The Appellants, in accordance with Rule 46(A)(4) of the Indiana Rules of Appellate Procedure, submit the following suggested issues for the Court's consideration:

1. Did the trial court commit reversible error in awarding the wrong amount of damages to Plaintiff for Defendant's Breach of Contract, when the exhibits show a lower amount of damages than what the court ordered?

## III.    STATEMENT OF THE CASE

Automotive Finance Corporation ("AFC") filed its *Complaint for Damages* in this matter on December 3, 2018, and thereafter filed its *Motion for Partial Summary Judgment* on February 8, 2019. Defendants filed their *Brief in Response to Plaintiff's Motion for Summary Judgment* on February 14, 2019, and on February 21, 2019, Plaintiff requested a hearing on its *Motion for Partial Summary Judgement.* The trial court set the matter for hearing on April 10, 2019.  On May 1, 2019 the trial court entered its *Order Denying Plaintiff's Motion for Partial Summary Judgment.*

Exhibit 2 (3 of 30)

On November 18, 2020, Plaintiff filed a *Motion for Determination Regarding Propriety of Venue and Jurisdiction in Marion County, Indiana*. On November 23, 2020, Defendants filed its *Response to Plaintiff's Motion for Preliminary Determination* and Plaintiff filed its *Reply in Support*. The trial court denied Plaintiff's *Motion for Determination Regarding Propriety of Venue and Jurisdiction in Marion County, Indiana* on December 23, 2020.

A virtual bench trial was conducted on January 5 and 6, 2021. The trial court took the evidence, testimony, and matter under advisement and issued its *Order on Bench Trial*, on February 24, 2021.  The trial court found Metro Motors and Herman Baker jointly and severally indebted to AFC for the SOT Vehicles in the principal sum of $78,996.46 and remaining deficiency after the sale of the Repossessed Vehicles in the amount of $123,666.66. On April 23, 2021, the trial court entered its *Entry of Final Judgement* and found Metro Motors and Baker liable for principal sum of $202,663.12, plus 15% accrued interest per annum from May 30, 2018 through April 9, 2021 totaling $87,034.10. The court awarded attorney's fees and expenses in sum of $32,618.75, for a total judgement of $323,315.97, plus accruing interest at the statutory rate.

On May 7, 2021, Defendant's filed their *Motion to Correct Error*. The Plaintiff filed its *Statement in Opposition to Judgment Defendants' Motion to Correct Error*. The trial court denied Defendant's *Motion to Correct Error*, in its *Order Denying Motion to Correct Error*, entered June 8, 2021.

## IV.    STATEMENT OF THE FACTS

On or about October 3, 2017, CT102 LLC d/b/a JD Byrider of New Haven and Metro Motors ("Metro Motors") executed an agreement ("Agreement") with the Plaintiff, Automotive Finance Corporation, Corp. ("AFC"). (Appellant's App., Vol. 2, p. 287 through 327).  As part of

Exhibit 2 (4 of 30)

Brief of Appellants

the Agreement, AFC required that Defendant H. Jeff Baker ("Baker") execute an Individual Guaranty on behalf of Metro Motors. Id. The Default Rate was 15% per annum under the Agreement. Id. The terms of Agreement entitled AFC to all attorney's fees and expenses. Baker was the Owner and Manager of Metro Motors. Id. Appellants made payments under the Agreement, and AFC accepted the benefits of this performance. (Tr. Vol. 2, Testimony of Michael Flanagan). Metro Motors in early 2018 became indebted to AFC. Id.

AFC had received returned checks from Metro, and as a result Mr. Flanagan went to Metro Motors' dealership in April and performed a lot audit. Id.  The Audit revealed that vehicles had been sold without remitting proceeds from the sales to AFC. Id. Additional lot audits were conducted, and sales of additional vehicles were discovered where the proceeds were not remitted. Id. After deadlines to remit payments were not made on May 28, 2018, Mr. Flanagan returned and conducted a final lot audit, finding six (6) vehicles sold out of trust, which means the vehicles were not present, and the funds had not been paid.  Id.  ON May 29, 2018, AFC repossessed 15 cars, and claims an additional four (4) vehicles financed by AFC were absent from Metro Motors' lot.  The combined total outstanding balance due on these ten (10) vehicles sold out of trust ("SOT") totaled $78,996.46. Id. and (Appellant's App., Vol. 2, p. 328 - 340).

The fifteen (15) Repossessed Vehicles were sold by AFC and the net sale proceeds was applied to the balances owed by Metro Motors. (Tr. Vol. , Vol. 2, Testimony of Jerome Bosl). After net sale proceeds were applied, the total unpaid principal amount due under the Agreement for the total twenty-five (25) cars, was $123,666.66 that was the "Total Principal Due", which included the ten vehicles sold out of trust. Id., Appellant's App., Vol. 2, p. 328 – 340  The "Total Interest Due" on the "Total Principal Due" was $4,921.25, and the "Total Fees

Exhibit 2 (5 of 30)

Due" was $6,619.75.  Id.

## V.     SUMMARY OF THE ARGUMENT

The trial court committed reversible error in incorrectly computing the total damages, in an amount not supported by scope of the evidence before the court.  The facts, testimony, and exhibits submitted at trial clearly establish that the amount shown in Plaintiff's Exhibits 4 and 5, admitted at trial is that the "Total Principal Due" was $123,666.66. Appellant's App., Vol. 2, p. 328 – 340.  The "Total Interest Due" on the "Total Principal Due" was $4,921.25, and the "Total Fees Due" was $6,619.75. Id.  This includes the vehicles sold out of trust.  Therefore, the total indebtedness, should have been found to have been $135,207.66, not $202,663.12. Because the base total indebtedness awarded was incorrect, the trial court's calculation of the interest and attorneys fees was also incorrect and should be reduced.  Therefore, the trail court's *Order on Bench Trial* and *Final* and *Entry of Final Judgement,* should be *reversed* and *remanded* for further proceedings.

## VI.     ARGUMENT

### A. The trial court committed reversible error in awarding the wrong amount of damages to Plaintiff for Defendant's Breach of Contract, when the exhibits show a lower amount of damages than what the court ordered.

#### 1.   Standard of Review

[t]he standard of review for a damage award is that no reversal will occur if the award is within the scope of evidence before the trial court; if the award of damages is supported by the record, the determination of damages is within the sound discretion of the trial court.

*Brant Const. Co. v. Lumen Const. Co.*, 515 N.E.2d 868, 872 (Ind. Ct. App. 1987), trans. denied.

An abuse of discretion occurs when the trial court's action is against the logic and effect of the facts and circumstances before it. In determining whether the trial court abused its discretion, we must only consider the evidence and reasonable inferences favorable to the non-moving party. We may not weigh conflicting

Exhibit 2 (6 of 30)

evidence or judge the credibility of witnesses.

*Menard, Inc. v. Comstock*, 922 N.E.2d 647, 650 (Ind. Ct. App. 2010)

> Generally, no particular degree of certainty is required in awarding damages so long as the amount awarded is supported by evidence and not based merely on speculation or conjecture. [*National Advertising Co. v. Wilson Auto Parts, Inc.*, 569 N.E.2d 997, 1001 (Ind. Ct. App. 1991).] And the plaintiff carries the burden of proof as to damages. *1271 *Forbes v. Walgreen Co.* (1991), —— Ind. App. —— –, 566 N.E.2d 90.

*McLean v. Trisler*, 161 N.E.3d 1259, 1270–71 (Ind. Ct. App. 2020), reh'g denied (Feb. 10, 2021), transfer denied sub nom. *McLean v. Koeppen*, 169 N.E.3d 1114 (Ind. 2021).

### 2. The trail court committed reversible error, by finding the incorrect total indebtedness amount owed by Defendant, which was clearly unsupported by the facts, testimony and evidence presented at trial.

Based on the evidence within the scope of the trial court, the trial court abused its discretion in awarding damages for the breach in contract in an amount unsupported by the evidence and exhibits admitted at trial. Through the testimony and evidence admitted at trial, specifically Plaintiff's admitted Exhibit(s) 4 and 5, clearly establish the total amount that Metro Motors and/ or Baker was indebted to AFC. Appellant's App., Vol. 2, p. 328 – 340; Tr. Vol. 2, Testimony of Jerome Bosl. Under Exhibits 4 and 5, the amount shown is that the "Total Principal Due" was $123,666.66, which was the total taken by adding the principal due for both the SOT Vehicles plus the Repossessed Vehicles, minus the net proceeds from the sale of the Repossessed Vehicles. (Tr. Vol. 2, Testimony of Jerome Bosl and Vol. 2 p. 328 - 340). The "Total Interest Due" on the "Total Principal Due" was $4,921.25, and the "Total Fees Due" was $6,619.75. Id at Vol. 2 p. 328 - 340. Therefore, the total indebtedness should have been found to have been $135,207.66. The trial court therefore, committed reversible error by finding the total indebtedness of Metro Motors and Baker to be in the amount of $202,663.12, when the facts, testimony, and evidence support only a finding that Metro Motors and/ or Baker

was indebted to AFC in the amount of $135,207.66.

Because the base total indebtedness awarded was incorrect, the trial court's calculation of the interest was also incorrect and should be reduced.

## VII.    CONCLUSION

The Court of Appeals should reverse the trial court's *Order on Bench Trial* and *Entry of Final Judgement*, in respect to findings for damages against Defendant. The trial court committed reversible error in incorrectly computing the total damages. The facts, testimony, and exhibits admitted at trial clearly establish that the "Total Principal Due" was $123,666.66, which was the total taken by adding the principal due for both the SOT Vehicles plus the Repossessed Vehicles, minus the net proceeds from the sale of the Repossessed Vehicles. (Tr. Vol. 2, Testimony of Jerome Bosl; Appellant's App., Vol. 2, p. 328-340). The "Total Interest Due" on the "Total Principal Due" was $4,921.25, and the "Total Fees Due" was $6,619.75. Appellant's App., Vol. 2, p. 328 - 340. Therefore, the total indebtedness, should have been found to have been $135,207.66, not $202,663.12. Id. Because the base total indebtedness awarded by the trial court was incorrect, the trial court's calculation of the interest and attorneys fees was also incorrect and should be reduced. Therefore, the trail court's *Order on Bench Trial* and *Final* and *Entry of Final Judgement,* should be *reversed* and *remand* for further proceedings.

Respectfully submitted,

/s/ Julie A. Camden
Julie A. Camden, #26789-49
**CAMDEN & MERIDEW, P.C.**
10412 Allisonville Road, Suite 200
Fishers, IN 46038

Exhibit 2 (8 of 30)

Direct Dial: (317) 770-0000
Telefax: (888) 339-9611
jc@camlawyers.com

## <u>CERTIFICATE OF WORD COUNT</u>

I verify that this Appellants' Brief contains no more than two thousand and five hundred (2,500) words.

/s/ Julie A. Camden
Julie A. Camden, #26789-49

## IX.    <u>CERTIFICATE OF SERVICE</u>

I certify that on August 9, 2021, I electronically filed the foregoing document using the Indiana E-Filing System (IEFS). I also certify that on August 9, 2021, the foregoing document was served upon the following persons via IEFS:

Cassandra Nielson

/s/ Julie A. Camden
Julie A. Camden, #26789-49

Exhibit 2 (9 of 30)

F I L E D
February 24, 2021
CLERK OF THE COURT
MARION COUNTY
DS

| | | |
|---|---|---|
| STATE OF INDIANA | ) | IN THE MARION SUPERIOR COURT |
| | ) SS | |
| COUNTY OF MARION | ) | CAUSE NO. 49D06-1812-CC-047850 |

AUTOMOTIVE FINANCE CORPORATION dba )
AFC AUTOMOTIVE FINANCE CORPORATION )
dba AFC )
                     )
             Plaintiff, )
     vs. )
                     )
CT102 LLC dba METRO MOTORS and )
HERMAN JEFFREY BAKER aka H. JEFFREY )
BAKER aka HERMAN J. BAKER aka )
H J BAKER aka JEFFREY BAKER aka )
JEFF BAKER )

## ORDER ON BENCH TRIAL

        This matter is before the Court on the Complaint filed by plaintiff Automotive Finance

Corporation dba AFC Automotive Finance Corporation dba AFC ("AFC" alternatively

"Plaintiff") filed on December 4, 2018 against CT102 LLC dba Metro Motors ("Metro"

alternatively, "Defendant(s)") and Herman Jeffrey Baker aka H. Jeffrey Baker aka Herman J.

Baker aka H J Baker aka Jeffrey Baker aka Jeff Baker ("Baker" alternatively "Defendant(s)").

All parties appeared by counsel and in person for a virtual bench trial conducted on January 5

and 6, 2021. The Court took the matter under advisement and instructed the parties to submit

proposed findings of fact and conclusions of law.  The Court, having reviewed the stipulations,

the testimony and evidence submitted at trial, and the arguments of counsel based on said

evidence, now issues the following Order:

## FINDINGS

**A.**    **Parties' Contracts.**

     1.     In October 2017, Metro executed a *Demand Promissory Note and Security*

*Agreement* ("Note") in favor of AFC.  [Stip. of Facts at ¶ 1 (Dec. 24, 2020); Plaintiff's Exhibit

Exhibit 2 (10 of 30)

(hereafter "Pl Ex." or plural "Exs.") Ex 1].  Simultaneous with the Note, Baker executed an *Unconditional and Continuing Guaranty* ("Guaranty"), personally guarantying all amounts due and owing to AFC under the terms of the Note.  [Stip. of Facts at ¶ 23; Pl Ex. 2; Defendant Exhibits (hereafter Def Ex." or plural "Exs.") W, AA].

2.      Pursuant to the terms of the Note, AFC provided to Metro, and Metro received, financing enabling Metro to purchase vehicles for sale in the course of its business.  [Stip. of Facts at ¶ 2; Pl Ex. 1].

3.      The Note and Guaranty were notarized and witnessed by Mike Flanagan ("Mr. Flanagan"), Branch Manager of the AFC Hartford, Connecticut at the time and now a Regional Director.  Defendant Baker submitted an Altered Guaranty [Def Ex. AA] with blue ink alterations changing the venue to Rhode Island.  The alterations were not initialed by Mr. Flanagan.

4.      The Default Rate under the Note and Guaranty accrue at the rate of 15% per annum with interest compounded daily. [Pl Ex. 1. p. 1].

5.      Pursuant to the Note and Guaranty, AFC is entitled to all attorney's fees and expenses.  [Stip. of Facts at ¶ 22; Pl Ex. 1, ¶ 9.15; Pl Ex. 2].

**1. Terms of the Note and Guaranty**

6.      Pursuant to paragraph 3.0 of the Note, AFC maintains a fully perfected security interest in all financed vehicles and their corresponding titles.  [Stip. of Facts at ¶ 3; Pl Ex. 1].

7.      The Note provides that Metro's payment obligation to AFC is unconditional and "shall not be affected by claims or disputes [Metro] may have . . . against [AFC]. [Pl Ex. 1, ¶ 5.2].

2

Exhibit 2 (11 of 30)

8.    Metro agreed to pay all "Obligations" as defined in the Note, including but not limited to "all Advances, debts, Purchase Money Inventory obligations, liabilities, financial obligations, charges, expenses, fees, attorney fees, costs of collection . . . owing, arising, due or payable from [Metro] to [AFC] of any kind or nature[.]" [Stip. of Facts at ¶ 4; Pl Ex. 1].

9.    Metro further agreed to pay all of AFC's fees, expenses, and costs incidental to the financing provided for under the Note.  [Pl Ex. 1, ¶ 9.3].

10.    Paragraph 4.0 of the Note requires: "[u]pon the sale of any item of Purchase Money Inventory, [Metro] shall hold the amount received from the disposition of inventory in trust for the benefit of [AFC] and [Metro] shall pay promptly to [AFC], in accordance with Section 2.6, an amount equal to the unpaid balance …".  Paragraph 2.6 of the Note requires Metro to remit the proceeds of sale of any AFC-financed vehicle within forty-eight (48) hours of disposition.  [Pl Ex. 1].

11.    Pursuant to Paragraph 8.1 of the Note, upon an event of default, AFC may "(a) notify any and all creditors, account debtors or obligors of [Metro's] default and/or of the security interest of AFC in [Metro's] accounts and . . . and direct payment of the same to [AFC] . . . (f) take possession of the Collateral and sell the same."  [Pl Ex. 1].

12.    Metro agreed that "sale of any vehicle by auction to other vehicle dealers shall be commercially reasonable" and that "[AFC] shall not be liable or accountable for the failure to seize, collect, realize, sell or obtain possession or payment of all or any part of the Collateral[.]" [Stip. of Facts at ¶ 20; Pl Ex. 1, ¶ 8.2].

13.    The Note provides for Metro's waiver of "(c) all defenses based upon suretyship or impairment of collateral; and (d) . . . any defenses which [Metro] may assert on the

3

Exhibit 2 (12 of 30)

Obligations, including but not limited to failure of consideration, breach of warranty, fraud, payment . . . lender liability, accord and satisfaction, and usury." [Pl Ex. 1, p. 1].

14.    By executing the Guaranty, Baker likewise agreed to waive "(a) all defenses based on suretyship, notice, impairment of collateral, or [AFC's] failure to perfect or keep failure of any security interest in the collateral; and (b) any defenses which [Baker] may assert on the Liabilities. . . ." [Pl Ex. 2, p. 1; Def Exs. W, AA].

### B. Default under the Note and Guaranty.

**1. Vehicles sold out of trust ("SOT")**

15.    Pursuant to Paragraph 5.1 of the Note, Metro agreed that it would not "remove, for a period exceeding twenty-four (24) hours, any item of Purchase Money Inventory from [Metro's] place of business." As previously noted, paragraph 2.6 of the Note requires Metro to remit the proceeds of sale of any AFC-financed vehicle within forty-eight (48) hours of disposition. [Pl Ex. 1]. The failure to remit proceeds for the sale of Purchase Money Inventory is commonly referred to as selling vehicles "out-of-trust" ("SOT"). [Trial Record (hereafter "TR") Jan. 5, at 1:37:05-1:37:31].

16.    The parties performed under the terms of the Note for a period of time until Metro became indebted to AFC in early 2018. [Stip. of Facts ¶ 6.].

17.    Specifically, AFC received numerous returned checks from Metro. Mr. Flanagan subsequently went to Metro's dealership in April to perform a lot audit, which audit ultimately revealed approximately eight (8) vehicles that had been sold by Metro without remitting the proceeds of such sales to AFC in violation of the Note. [TR, Jan. 5, at 33:45-34:15, 1:45:40-1:46:12].

4

Exhibit 2 (13 of 30)

18.    Additionally, Metro failed to remit payments due under the principal line of the Note. [TR, Jan. 5, at 1:45:40-1:46:12].

19.    Mr. Flanagan conducted additional lot audits and sales of additional vehicles were discovered. [TR, Jan. 5, at 34:45-35:03; 40:55-42:00].

20.    Although Metro assured Mr. Flanagan and AFC that payments would be remitted under the Note, with AFC extending numerous deadlines for Metro's payment, Metro failed to remit payments when due. [TR, Jan. 5, at 44:00-44:10].

21.    Mr. Flanagan returned to Metro on May 28, 2018 to conduct a lot audit and request vehicle keys, intending to amicably secure possession of AFC's collateral under the Note. [TR, Jan. 5, at 44:47-45:35]. Metro refused to relinquish keys to AFC's collateral. [TR, Jan. 5, at 44:47-45:15; Jan. 6, at 2:55:58-2:56:03].

22.    Also on May 28, 2018, Mr. Flanagan observed that six (6) vehicles were sold out of trust without remitting the proceeds of such sale and/or disposition to AFC as required under the terms of the Note. [Stip. of Facts ¶¶ 7-12; Pl Ex. 4]. According to AFC, the outstanding balance due to AFC on those 6 vehicles totals $37,502.78. [Pl Ex. 5].

23.    Further, Mr. Flanagan later observed that four (4) additional vehicles financed by AFC were absent from Metro's lot (the "Missing AFC Inventory"). [Stip. of Facts at ¶¶ 13-16; TR, Jan. 5, at 46:30-47:37]. According to AFC, the outstanding balance due on the Missing AFC Inventory vehicles totals $41,493.68. [Pl Ex. 5].

24.    The ten (10) vehicles including the group of 6 vehicles and the 4 Missing AFC inventory, collectively, constitute the "SOT Vehicles." According to AFC, the total amount owed for the ten (10) SOT Vehicles is $78,996.46. [Pl Exs 4 and 5].

**2. Repossession of Vehicles from Metro.**

5

Exhibit 2 (14 of 30)

25.     On night of May 29-30, 2018, AFC repossessed fifteen (15) AFC financed
vehicles, (collectively, the "Repossessed Vehicles").  [Stip. of Facts at ¶ 17].  The repossession
was facilitated by PAR North America ("PAR") and accomplished by Skyline Recovery Service
(hereafter "Skyline").  [TR, Jan. 5, at 45:50-46:01].

26.     In conjunction with the repossession, Skyline completed *Vehicle Condition
Reports* for each of the Repossessed Vehicles.  [Pl Exs. 10-23].  This Court acknowledges that
all the vehicles involved were used and no vehicles were likely "pristine" as described by the
service manager of Metro Motors, Luigio Zaccarella during his testimony.  However, the *Vehicle
Condition Reports* were clearly not a detailed review of the cars' condition upon repossession
and each of the *Reports* was very similar to the next.

**C.    Sale of Repossessed Vehicles and Deficiency Balance.**

27.     AFC issued Notifications of Disposition of Collateral for the Repossessed
Vehicles ("Disposition Notices") to Metro and Baker.  [Pl Ex. 6; TR, Jan. 5,  at 2:34:40-2:35:40].

28.     The Disposition Notices were simultaneously issued to NextGear Capital Inc. and
American Credit Acceptance, LLC pursuant to Ind. Code. § 26-1-9.1-611(c)(3)(A).  [Pl Ex. 6].
No evidence was introduced to suggest that any of the Vehicles were "double floorplanned."
[TR, Jan. 5, at 2:21:55-2:22:20].

29.     Metro and Baker received the Disposition Notices.  [Plaintiff's Ex. 7, Plaintiff's
Ex. 8].  At no time prior to sale did Metro redeem the collateral or otherwise remit payment of
any indebtedness to AFC.  [TR, Jan. 5, at 2:38:15-2:38:21].

30.     Thereafter, PAR facilitated all remarketing efforts of the Repossessed Vehicles on
behalf of AFC.  PAR sold all the repossessed vehicles through either ADESA Boston, a
nationally recognized, wholesale vehicle auction specializing in sales to licensed and registered

6

Exhibit 2 (15 of 30)

vehicle dealers. [TR, Jan. 5, at 3:24:30-3:25:09] or TradeRev is an online-only, wholesale vehicle auction specializing in sales to licensed and registered vehicle dealers. [TR, Jan. 5, at 3:26:26-3:26:35].

31.    The vehicles were repossessed on May 29-30, 2018. Plaintiff's employee Nick Reisinger testified that 20-30 days is a quick turnaround from repossession to sale. In that window, titles need to be processed and repairs to vehicles may need to be made. Here, the first Repossessed Vehicle was resold thirty-eight (38) days later on July 5, 2018 and within sixty (60) days, by September 5, 2018 ten (10) vehicles had been sold through TradeRev. The remaining five (5) were sold through ADESA Boston between August 17 and October 26, 2018.

32.    With the exception of the October 26, 2018, ADESA sale of a 2008 Jeep Compass sold at ADESA Boston for $1,800.00 [TR, Jan. 5, at 3:35:00-3:40:00, 3:57:20-4:10:22; Pl Ex. 24], the remaining sales seem to have been sold in a reasonable timeframe. The October 26 sale is a noticeable outlier, but Plaintiff's witness, Mr. Reisinger, testified that the Compass had been offered at six (6) previous auctions.

33.    Overall, the sale of the Repossessed Vehicles resulted in net sale proceeds to AFC in the sum of $64,651.39 (the "Sale Proceeds"). [Pl Exs. 24-38].

34.    The Sale Proceeds were received by AFC and applied to balances for each the individual units to reduce the total indebtedness due under the Note. [TR, Jan. 5, at 48:20-49:10]. Upon application of the Sale Proceeds, a deficiency balance existed under the Note in the sum of $123,666.66. [Pl Ex. 1, 4 and 5; TR, Jan. 5, at 49:27, 2:12:42-2:13:36, 1:54:40-1:57:02, 1:59:10-1:59:22].

Exhibit 2 (16 of 30)

35. Pursuant to Paragraph 2.8 of the Note, "[t]he aggregate unpaid principal amount, interest, fees, and other Obligations so recorded by [AFC] shall constitute prima facie evidence of the sums owing and unpaid under this Note." [Pl Ex. 1].

### D. AFC's Complaint and Litigation.

36. On December 4, 2018, AFC initiated this action by filing its Complaint, alleging indebtedness due under the terms of the Note, the liability of Baker under the Guaranty, and treble damages as a result of Metro's conversion of proceeds of the sale of AFC's collateral.

37. As exhibits to its Complaint, AFC attached and incorporated the Note and Guaranty, admitted herein as Plaintiff's Exhibit 1 and Plaintiff's Exhibit 2.

38. In his *Answer and Affirmative Defenses* filed on December 27, 2018, Baker did not deny execution of the Guaranty under oath or by affidavit, nor did he move to change venue or otherwise affirmatively contest the jurisdiction of this Court.

### DISCUSSION

### A.    Jurisdiction and Venue.

39. Pursuant to Paragraph 9.11 of the Note, which provides that "[b]y execution of this Note, [Metro] submits to the personal jurisdiction of State and Federal Courts in Indiana and to venue in the circuit and superior courts of . . . Marion County, Indiana." [Pl Ex. 1]. Likewise, page 2 of the Guaranty establishes venue in . . . Marion County, Indiana. [Pl Ex. 2].

40. Baker submitted his Altered Guaranty at trial [Def Ex. AA], but it was not part of the pleadings and the disputed alteration is not initialed by Plaintiff's witness, Mike Flanagan, who notarized the Guaranty, but testified that he has no recollection of any alterations to the document. [TR Jan. 5, at 26:37-27:27]. Plaintiff's Note and Guaranty are presumed under INTR 9.2(D) and establish venue in Marion County. The Court has subject matter jurisdiction in this

8

Exhibit 2 (17 of 30)

cause of action.

**B.    Metro's Breach of the Note.**

41.    A written contract is presumed to embody the parties' entire agreement and merge within it all prior negotiations. *Buschman v. ADS Corp.*, 782 N.E.2d 423, 424 (Ind. Ct. App. 2003); *Cowper v. Collier*, 720 N.E.2d 1250, 1256 (Ind. Ct. App. 1999) (citing *McCae Management Corp. v. Merchants National Bank & Trust Co.*, 553 N.E.2d 884, 887 (Ind. Ct. App. 1990)).  Under Indiana's "four corner doctrine," contracts are enforced according to the plain meaning of their terms where the contract language is unambiguous. *See Peoples Bank & Trust Co. v. Price*, 714 N.E.2d 712, 716-17 (Ind. Ct. App. 1999); *First Savings & Loan Association v. Treaster*, 490 N.E.2d 1149, 1152 (Ind. Ct. App. 1986).

**(i)    Execution, Default, and Principal Indebtedness Under the Note.**

42.    Metro admits execution of the Note.  [Stip. of Facts at ¶ 1; Pl Ex. 1].  By execution, Metro agreed its payment obligation was unconditional and "shall not be affected by claims or disputes [Metro] may have . . . against [AFC].  [Pl Ex. 1, ¶ 5.2].  Further, it agreed to pay all "Obligations" as defined in the Note, including but not limited to "all Advances, debts, Purchase Money Inventory obligations, liabilities, financial obligations, charges, expenses, fees, attorney fees, costs of collection . . . owing, arising, due or payable from [Metro] to [AFC] of any kind or nature[.]" [Stip. of Facts at ¶ 4; Pl Ex. 1].  Such agreement also extended to all of AFC's fees, expenses, and costs incidental to the financing provided for under the Note.  [Pl Ex. 1, ¶ 9.3].

43.    Based upon the evidence before the Court, Metro breached the unambiguous terms of the Note by failing to make payment to AFC when due, constituting an event of default under paragraph 7.1 of the Note.  [Stip. of Facts at ¶ 6; Pl Ex. 1, ¶ 7.1].

Exhibit 2 (18 of 30)

44.     Pursuant to Paragraph 2.8 of the Note, "[t]he aggregate unpaid principal amount, interest, fees, and other Obligations so recorded by [AFC] shall constitute prima facie evidence of the sums owing and unpaid under this Note."  [Pl Ex. 1].

45.     The indebtedness due under the Note is calculated by AFC's automated system(s) and includes the total balance due for each AFC-financed vehicle together with interest and contractual fees.  [TR, Jan. 5, at 2:00:57-2:01:42; Pl Exs 4 and 5].

46.     Mike Flanagan testified that at no time did AFC charge any fee not otherwise authorized under the Note.  [TR, Jan. 5, at 8:55, 56:15-56:20].  Furthermore, Mr. Jerome Bosl, Corporate Investigator with AFC testified that at no time did AFC's records show the assessment of any unauthorized fee or charge.  [TR, Jan. 5, at 1:41:13-1:43:39, 2:39:00-2:39:50].

47.     Moreover, pursuant to the unambiguous language of the Note, Metro waived "(d) . . . any defenses which [Metro] may assert on the Obligations[.]"  [Pl Ex 1, p. 1].  Such constitutes a valid waiver of any defenses asserted by Metro—including on the indebtedness. *Kruse,* 815 N.E.2d at 150-51; *see, e.g., Houin v. Bremen State Bank*, 495 N.E.2d 753, 759 (Ind. Ct. App. 1986).

48.     A party to a contract "is presumed to understand and asset to the terms of the contracts he or she signs." *Sanford v. Castleton Health Care Ctr., LLC*, 813 N.E.2d 411, 418 (Ind. Ct. App. 2004).  Mr. Baker, the principal and owner of Metro, testified to having over fifteen (15) years within the business industry, much of which was spent in business financing and lending.  [TR, Jan. 6, at 2:21:34:-2:22:17].  In fact, in 2016, Mr. Baker, on behalf of Byrider of New Haven entered a similar agreement with AFC. [Pl Ex. 3].   A sophisticated enterprise, Metro received and utilized the freely-bargained for benefits bestowed by the Note and had the clear ability to take its business elsewhere and indeed did based upon its corresponding contract

10

Exhibit 2 (19 of 30)

with NextGear Capital, Inc. for similar services.  [TR, Jan. 6, at 3:10:14-3:10:23]. A contract is

not unenforceable merely because one party enjoys advantages over the other. *Sanford v.*

*Castleton Health Care Ctr., LLC,* 813 N.E.2d 411,418 (Ind. Ct. App. 2004).   The Court

concludes that the Note does not constitute a contract of adhesion or is otherwise

unconscionable.

**(ii)    Metro's Sale of Financed Vehicles "Out of Trust" and Further Default.**

49.    Metro readily admits it failed to remit the proceeds of six (6) of the SOT Vehicles,

totaling $37,502.78, to AFC as required by the clear, unambiguous terms of the Note.  [Stip. of

Facts at ¶¶ 7-12; Pl Exs. 1 and 5].

50.    As to the remaining four (4) Missing AFC Inventory, on numerous occasions

prior to the repossession, Mr. Flanagan returned to Metro to perform lot audits and noted the

Missing AFC Inventory.  [TR, Jan. 5, at 46:30-47:37; and Jan. 6, at 4:02:10-4:06:12].  From

discussions with Metro's sale's manager, Jay Wanczyk, Mr. Flanagan learned that at least one

(1) vehicle had been sold to a buyer in Connecticut, one (1) vehicle was possibly with a

customer, and the remaining vehicles were all unaccounted for.  [TR Jan. 6, at 4:02:10-4:06:12,

4:13:03].

51.    Mr. Wanczyk managed Metro's day-to-day operations and largely served as

AFC's point of contact at Metro.  Testimony reveals Baker regularly instructed Mr. Wanczyk

with respect to Metro's business operations and sales of inventory, including in the presence of

Mr. Flanagan.  As such, Mr. Wanczyk, by nature of his position as sales manager, is clothed with

both apparent and inherent authority to represent Metro, particularly with respect to vehicle

inventory.  *Gallant Ins. Co. v. Davis*, 751 N.E.2d 672 (Ind. 2001).

11

Exhibit 2 (20 of 30)

52.     Neither the Missing AFC Inventory, or proceeds therefrom, has been returned to AFC.  [TR, Jan. 6, at 4:02:10-4:06:12, 4:13:03].  Accordingly, the Court concludes the Missing AFC Inventory constitute 4 additional vehicles sold out of trust.  In total, ten (10) SOT Vehicles were sold by Metro in contravention of the Note.

53.     The total amount owed to AFC for the ten (10) SOT Vehicles is $78,996.46.  [Pl Exs. 4 and 5].  Metro's failure to remit the proceeds of the SOT Vehicles does not constitute conversion pursuant to the Indiana Crime Victims Relief Act.  The Note provides the remedy.  The contractual Default Rate of 15% is applied as of the date of default-- May 30, 2018.

**C.      Repossession and Sale of Repossessed Vehicles.**

54.     Where a secured party undertakes collection and/or enforcement of an obligation against an account debtor or other person obligated on collateral, said secured party must "proceed in a commercially reasonable manner."  Ind. Code § 26-1-9.1-607(c).  Similarly, "every aspect of a disposition of collateral, including the method, manner, time, place, and other terms, must be commercially reasonable."  Ind. Code 26-1-9.1-610(b). After Metro's default under the Note, AFC engaged PAR to facilitate repossession of AFC's collateral.

**(i)      Repossession.**

55.     A defendant asserting the defense of failure to mitigate damages must prove by a preponderance of the evidence that "the plaintiff has not used reasonable diligence to mitigate damages."  *Willis v. Westerfield*, 839 N.E.2d1179, 1187 (Ind. 2006) (citations omitted).  Given his testimony as the only Metro Motors employee to witness the repossession of its vehicles, it is curious that Luigio Zaccariello, the service manager for Metro was unknown to the Plaintiff and was not listed as a potential witness until a Second Amended Witness and Exhibit List was filed on December 16, 2020.  Regardless, Mr. Zaccariello testified that he was using Metro's garage to

12

Exhibit 2 (21 of 30)

do some mechanical work on one of his cars on the night of the repossession on May 29-30, 2018.

56.      Mr. Zaccariello testified to the "pristine" condition of many of the vehicles prior to the repossession, but this Court is hard pressed to believe that testimony given the age and mileage of the vehicles.  He witnessed the arrival of three (3) wreckers and a "couple" of flatbeds and observed the entire repossession process.   Mr. Zaccariello testified that he never examined the vehicles after the repossession or even during the repossession [TR, Jan 6, at 33:19-33:22]. He testified that some of the four-wheel and/or all wheel vehicles were not properly loaded causing them to skid on the lot.  Despite his observations he did not video, photograph or in any way document any of the damage to the Repossessed Vehicles.  Mr. Zaccariello witnessed PAR clearing the lot of fifteen (15) vehicles, but Defense presented no evidence that Mr. Zaccariello attempt to text or contact anyone at Metro to report this calamity.  We do know from Mr. Baker's testimony that he did not become aware of the repossession until he arrived at Metro Motors the following morning.  This seems odd.

57.      Skyline completed *Vehicle Condition Reports* for each of the Repossessed Vehicles.  Additional inspections of the Repossessed Vehicles were conducted by PAR and such inspections yielded no evidence of damage consistent with transportation or repossession.  [TR, Jan. 5, at 3:08:06-3:08:15; 3:18:02-3:19:10; Pl Exs. 10-23].

58.      Subsequent to the repossession, Flanagan returned to Metro on two (2) occasions and observed no skid marks on the lot or other repossession damage.  [TR, Jan. 5, at 56:43-57:16].  Overall, this Court acknowledges that some damage may have occurred during the repossession, but the evidence presented suggests that it was *de minimis*.

13

Exhibit 2 (22 of 30)

59.     An obligor may prospectively consent to a creditor's impairment of collateral and thereby waive the right to claim impairment of collateral as a defense. *Hedrick v. First Nat'l Bank & Trust Co. of Plainfield*, 482 N.E.2d 1146 (Ind. Ct. App. 1985).  Here, Metro clearly waived "all defenses based upon . . . impairment of collateral." [Pl Ex. 1, p.1].  As such, and by executing the Note, Metro "waived any legal duty [AFC] may have had to protect the collateral." *United States v. Lair*, 854 F.2d 233, 236 (7th Cir. 1988) (citing *United States v. Meadors*, 753 F.2d at 595) (interpreting Indiana Law).

60.     Accordingly, the evidence before the Court establishes that AFC's repossession of the Repossessed Vehicles was conducted in a commercially reasonable fashion.

**(ii)     AFC's Disposition Notices Conform to Indiana Law.**

61.     Pursuant to Indiana law, AFC issued the Disposition Notices to Metro, Baker, American Credit Acceptance, LLC and NextGear Capital, Inc. [Pl Ex. 6].  The Disposition Notices comport with Indiana law and contain the information and language required under Ind. Code § 26-1-9.1-613.  As ADESA Boston and TradeRev auctions are limited to licensed, registered automotive dealers and not available to the public, such constitutes a private sale for purposes of notification.  *See, e.g., Ford Motor Credit Co. v. Solway*, 825 F.2d 1213, 1218 (7th Cir. 1987) (holding that where auction was limited to retail automobile dealers, such constituted a private sale.)  Accordingly, AFC is required only to state "the time after which any other disposition is to be made."  Ind. Code § 26-1-9.1-613(E).

**(iii)     Sales of the Repossessed Vehicles Constitute Commercially Reasonable Sales.**

62.     A disposition of collateral is "commercially reasonable" where the disposition is "made (1) in the usual manner on any recognized market; (2) at the price current in any recognized market at the time of the disposition; or otherwise in conformity with reasonable

14

Exhibit 2 (23 of 30)

commercial practices among dealers in the type of property that was the subject of the disposition." Ind. Code 26-1-9.1-627(b). The "fact that a greater amount could have been obtained by a collection, enforcement, disposition, or acceptance at a different time or in a different method from that selected by the secured party is not of itself sufficient to preclude the secured party from establishing that the collection, enforcement, disposition, or acceptance was made in a commercially reasonable manner." Ind. Code § 26-1-9.1-627(a).

63.    Pursuant to Paragraph 8.5 of the Note, Metro agreed that the "sale of any vehicle by auction to other vehicle dealers shall be commercially reasonable." [Pl Ex. 1]. In this instance, the Repossessed Vehicles were sold at ADESA Boston and TradeRev auctions. [Pl Exs. 24-38]. Every Repossessed Vehicle was subjected to competitive bidding at auction and sold for market value. [TR, Jan. 5, at 3:35:00-3:40:00, 3:57:20-4:10:22].

64.    Where, as here, "a security agreement deems a particular means of disposing of the collateral to be commercially reasonable, then compliance with that provision is strong evidence that the secured party's disposition of the collateral was commercially reasonable." *Ford Motor Credit Co*., 825 F.2d at 1218. In addition, AFC presented employee Nick Reisinger who testified that he has fifteen (15) years of experience with remarketing of vehicles in various capacities. Mr. Reisinger testified to his specific review of the sales of the Repossessed Vehicles and their comparison to industry standards and guides. [TR, Jan. 5, at 3:07:06-3:07:30].

65.    The Court finds Mr. Reisinger's testimony concerning the conduct of the auctions and the commercial reasonableness of the sales persuasive. Accordingly, the Court finds that both auctions utilized for the sale of the Repossessed Vehicles comport with relevant industry standards. Accordingly, Metro is indebted to AFC for its remaining deficiency after the sale of the Repossessed Vehicles in the amount of $123,666.66.

15

Exhibit 2 (24 of 30)

## ORDER AND ENTRY OF FINAL JUDGMENT

The Court, having accepted evidence, testimony, and argument from AFC, Metro, and Baker, and being otherwise duly advised in the premises, now finds for AFC on its Complaint as follows:

IT IS THEREFORE ORDERED, ADJUGED AND DECREED that CT102 LLC dba Metro Motors Metro and Herman Baker are *jointly and severally* indebted to AFC for the following:

a.   The ten (10) SOT Vehicles in the principal sum of $78,996.46;

b.   The deficiency amount remaining after the sale of the fifteen (15) Repossessed Vehicles totaling $123,666.66; and

c.   Interest at the Default Rate of 15% on the outstanding debt of $202,663.12 ("a" and "b" above) beginning on May 30, 2018 plus interest accruing from the date of this Order at the statutory rate.

IT IS FURTHER ORDERED THAT this Court will fix the amount accrued interest (described in "c" above) and discuss attorney fees and expenses on the following date (Parties need to inform the Court if they prefer a WebEx hearing): **Tuesday, March 23, 2021 at 10:00am**

After that date, the Court will issue an Order in the final judgment amount.

SO ORDERED: __February 24, 2021__

_____
JUDGE, MARION SUPERIOR COURT

**DISTRIBUTION:**
Per Parties in Odyssey

16

Exhibit 2 (25 of 30)

F I L E D
April 23, 2021
CLERK OF THE COURT
MARION COUNTY
DS

STATE OF INDIANA     )           IN THE MARION SUPERIOR COURT
                         ) SS
COUNTY OF MARION    )           CAUSE NO. 49D06-1812-CC-047850

AUTOMOTIVE FINANCE CORPORATION dba  )
AFC AUTOMOTIVE FINANCE CORPORATION )
dba AFC                                       )
                                               )
                 Plaintiff,           )
                                               )
      vs.                                    )
                                               )
CT102 LLC dba METRO MOTORS and         )
HERMAN JEFFREY BAKER aka H. JEFFREY   )
BAKER aka HERMAN J. BAKER aka           )
H J BAKER aka JEFFREY BAKER aka         )
JEFF BAKER                                  )

## <u>ENTRY OF FINAL JUDGMENT</u>

This matter is before the Court on the Complaint (the "Complaint") filed by plaintiff

Automotive Finance Corporation dba AFC Automotive Finance Corporation dba AFC ("AFC")

filed on December 4, 2018 against CT102 LLC dba Metro Motors ("Metro") and Herman Jeffrey

Baker aka H. Jeffrey Baker aka Herman J. Baker aka H J Baker aka Jeffrey Baker aka Jeff Baker

("Baker"). All parties appeared by counsel and in person for a virtual bench trial conducted on

January 5, 2021 and January 6, 2021. The Court, having reviewed the stipulations, the testimony

and evidence submitted at trial, and the arguments of counsel based on said evidence, issued its

*Order on Bench Trial* on February 24, 2021 pursuant to Rule 52 of the Indiana Rules of Trial

Procedure and reserved the issue of attorney fees for separate determination (the "Findings

Order").

On March 30, 2021, the parties appeared by counsel and presented evidence, testimony,

and argument regarding AFC's entitlement to attorney fees.  After said hearing, the Court took

the matter under advisement and instructed the parties to submit proposed orders.  The Court,

Exhibit 2 (26 of 30)

having considered the evidence, testimony, and arguments of counsel based on said evidence and testimony, now finds AFC is entitled to an award of attorney's fees and an entry of final judgment.

IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED that the Findings Order, and all paragraphs contained therein, is hereby incorporated by reference as if fully set forth herein.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Automotive Finance Corporation dba AFC Automotive Finance Corporation dba AFC be, and hereby is, awarded judgment against CT102 LLC dba Metro Motors and Herman Jeffrey Baker aka H. Jeffrey Baker aka Herman J. Baker aka H J Baker aka Jeffrey Baker aka Jeff Baker, *jointly and severally*, in the principal sum of $202,663.12, plus accrued interest at the contractual rate of 15% per annum from May 30, 2018 through April 9, 2021 of $87,034.10, together with attorney's fees and expenses in the sum of $32,618.75, for a total judgment of $322,315.97 as of April 9, 2021, plus interest accruing thereafter at the statutory rate.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that there is no just reason for delay and this Court expressly directs the entry of judgment against defendants CT102 LLC dba Metro Motors and Herman Jeffrey Baker aka H. Jeffrey Baker aka Herman J. Baker aka H J Baker aka Jeffrey Baker aka Jeff Baker, *jointly and severally*, on Automotive Finance Corporation dba AFC Automotive Finance Corporation dba AFC's Complaint in accordance with Indiana Rule of Trial Procedure 54(B).

SO ORDERED:  __April 23, 2021_____

_____
JUDGE, MARION SUPERIOR COURT

2

Exhibit 2 (27 of 30)

DISTRIBUTION:

Cassandra A. Nielsen
RUBIN & LEVIN, P.C.
135 N. Pennsylvania St., Suite 1400
Indianapolis, Indiana  46204
(317) 634-0300 - FAX No. (317) 263-9410
Email:  cnielsen@rubin-levin.net
CAN
g:\wp80\jsimpson\can\afc-metro-21811008\entry of final judgment in case final.docx

Julie A. Camden, Esq.
CAMDEN & MERIDEW, PC
10412 Allisonville Rd., Ste. 200
Fishers, IN  46038
Email:  jc@camlawyers.com

3

Exhibit 2 (28 of 30)

STATE OF INDIANA       )            IN THE MARION SUPERIOR COURT
                              )SS:
COUNTY OF MARION      )            CAUSE NO.   49D06-1812-CC-047850

AUTOMOTIVE FINANCE CORPORATION     )
dba AFC AUTOMOTIVE FINANCE            )
CORPORATION dba AFC                   )
                                    )
         Plaintiff,                  )
                                    )
    vs.                             )
                                    )
CT102 LLC dba METRO MOTORS and      )
HERMAN JEFFREY BAKER aka H. JEFFREY  )
BAKER aka HERMAN J. BAKER aka H J     )
BAKER aka JEFFREY BAKER aka JEFF     )
BAKER                                )
                                    )
         Defendants.              )

**F I L E D**

June 8, 2021

CLERK OF THE COURT
MARION COUNTY
JW

## **ORDER DENYING MOTION TO CORRECT ERROR**

This matter came before the Court on the *Motion to Correct Error* ("Motion") filed by judgment defendants CT102LLC d/b/a Metro Motors and Herman Jeffrey Baker a/k/a H. Jeffrey Baker a/k/a Herman J. Baker a/k/a H J Baker a/k/a Jeffrey Baker a/k/a Jeff Baker (collectively, "Defendants") and the *Statement in Opposition to Judgment Defendants' Motion to Correct Error* ("Statement in Opposition") filed by Plaintiff Automotive Finance Corporation d/b/a AFC Automotive Finance Corporation d/b/a AFC. The Court having considered the Motion and Statement in Opposition, now finds the Motion is not well taken and should be denied.

**WHEREFORE, IT IS ORDERED, ADJUDGED AND DECREED** that Defendants' Motion to Correct Error be, and hereby is, DENIED in its entirety.

SO ORDERED: **June 8, 2021**

_____
JUDGE, MARION SUPERIOR COURT

Exhibit 2 (29 of 30)

DISTRIBUTION:

Cassandra A. Nielsen
RUBIN & LEVIN, P.C.
135 N. Pennsylvania St., Suite 1400
Indianapolis, IN  46204
(317) 634-0300 - Fax (317) 263-9410
Email:  cnielsen@rubin-levin.net
G:\WP80\JSIMPSON\CAN\AFC-Metro-21811008\Order Denying MTCE.wpd

Julie A. Camden
CAMDEN & MERIDEW, PC
10412 Allisonville Rd., Ste. 200
Fishers, IN  46038
Email:  jc@camlawyers.com

2

Exhibit 2 (30 of 30)